UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 19 CR 932 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| SEDGWICK WILLIAMS | ) | |

**GOVERNMENT'S POSITION PAPER
AS TO SENTENCING FACTORS**

## I.    INTRODUCTION

Between August 2019 and December 2019, Sedgwick Williams, Ivan Ayers, Tai Hon La, and Jonathan Vargas participated in a violent kidnapping conspiracy that targeted specifically identified victims in Chicago and the neighboring suburbs. The conspirators impersonated law enforcement officers to "arrest" their victims, handcuffing and holding them captive while the conspirators interrogated them, threatened them, and sought to obtain money, drugs, and other valuables from them.

As part of the conspiracy, in October 2019, Williams, Ayers, La, and Vargas kidnapped a victim at gunpoint outside his electronics store in Naperville and took him to a vacant apartment located at 6901 East End Avenue in Chicago, where they interrogated, threatened, assaulted, and tortured him, and sought to extort his family for money to secure his release. Unable to obtain the ransom, they robbed the victim's store and then dumped him on the south side of Chicago. In November 2019, pretending to be DEA agents, Williams and Ayers kidnapped multiple victims at gunpoint in connection with an armed home invasion in Westchester. In December

1

2019, Williams, Ayers, and La attempted to kidnap another victim at gunpoint in South Holland as part of an attempted armed home invasion.

Williams was charged with conspiring to commit kidnapping, in violation of 18 U.S.C. § 1201(c) (Count One); kidnapping the Naperville victim, in violation of 18 U.S.C. § 1201(a)(1) (Count Two); kidnapping the Westchester victims, in violation of 18 U.S.C. § 1201(a)(1) (Counts Three through Six); impersonating a federal law enforcement officer, in violation of 18 U.S.C. § 912 (Count Seven); and the attempted kidnapping of the South Holland victim, in violation of 18 U.S.C. § 1201(d) (Count Eight). Williams proceeded to a jury trial, which began on May 7 and ended on May 22, 2024. Dkt. 394–411. The jury found Williams guilty on all counts. Dkt. 411, 499.

For the reasons discussed below, the Court should sentence Williams to life imprisonment.

## II.     BACKGROUND

Between September 2019 and December 2019, Williams, Ayers, La, and Vargas participated in a series of violent criminal offenses.

### A.     Bryn Mawr Avenue (September 9, 2019)

On September 9, 2019, Williams, Ayers, Vargas, and others participated in the robbery of a high-stakes poker game located on the second floor of 3222 West Bryn Mawr Avenue in Chicago. *See* PSR, ¶ 83.

While Ayers served as a lookout in the car, the others entered the building to commit the robbery. Armed with guns, including an AR-15 rifle, and dressed as law enforcement officers, they went up to the second floor. Upon entering the poker game

2

area, one of them said something to the effect of: "DEA! Police! Everyone on the floor. Hands out. Face down." They handcuffed several people and searched them for valuables. They stole between approximately $10,000 and $20,000 in cash, jewelry, and at least one firearm, the latter of which was recovered from the Chevrolet Malibu that Ayers was driving when he was stopped by the police on November 12, 2019, and which had Ayers's DNA on it. The Chicago Police Department Incident Report is attached as <u>Exhibit A</u>; a report of the FBI's interview with one of the victims is attached as <u>Exhibit B</u>; *see also* Exhibit 3 (report of FBI interview with Vargas) to the Government's Version of the Offense (GVO) at p. 7; Dkt. 184 (Ayer's plea agreement) at p. 3.

As reflected below, during a search of Williams's cell phone, which was recovered during Williams's December 2019 arrest in South Holland, law enforcement found videos of jewelry, dated September 9, 2019, that matched the jewelry stolen from one of the victims during the robbery.



| | |
|---|---|
| *Photographs of items stolen during poker game robbery* | *Screenshot from video recovered from Williams's cell phone* |

### B. Naperville (October 17–18, 2019)

On October 17–18, 2019, Williams, Ayers, La, and Vargas kidnapped Victim 1 outside his electronics store in Naperville. *See* PSR, ¶¶ 7, 20–24.

Williams identified Victim 1 as a promising victim to target, believing that Victim 1 and his brother had ready access to lots of money and cell phones. On the evenings of October 14 and October 15, 2019, Williams and Ayers drove out to Naperville to conduct surveillance of Victim 1 at his store. Williams's proposed plan involved impersonating law enforcement officers to "arrest" Victim 1 after he closed his store for the night, in order to disarm, handcuff, interrogate, and rob him.

On the evening of October 17, 2019, La drove down from northern Illinois in his white Mercedes SUV to meet up with Ayers and Vargas. The three of them drove out to Naperville together in a white Chevrolet Malibu, which Ayers had borrowed and which was outfitted with police-style emergency lights. They were armed and wore vests that had "DEA" or "Police" written on them. Meanwhile, Williams drove separately to Naperville and went inside Victim 1's electronics store to ensure that he was alone. While inside the store, Williams called Ayers to let Ayers, La, and Vargas know that Victim 1 was alone in the store and would be leaving soon. Williams left the store and waited for his co-conspirators to arrive. Just before Victim 1 was abducted, Williams received a text from Tekira Davis, who loaned Williams a ballistic vest that he used in furtherance of the conspiracy, asking what he was going to do with the crime proceeds; Williams responded: "Lmaooo I didn't get nothing yet baby." The text message exchange is attached as Exhibit C.

When Victim 1 exited his store just before 10:00 p.m., Ayers, La, and Vargas drove up to Victim 1 in the Chevrolet Malibu with the police-style lights flashing. La and Vargas got out of the car, announced that they were the police, pointed guns at Victim 1, handcuffed him, and, along with Ayers, forced Victim 1 into the backseat of their car, as Williams had previously instructed them to do. Video surveillance footage of Victim 1's abduction is attached as Exhibit D and Exhibit E.

5



*Screenshot from video surveillance footage of Victim 1's abduction*

After abducting Victim 1, Ayers, La, and Vargas drove to the west side of Chicago to meet up with Williams. At Williams's direction, La and Vargas drove Victim 1 to a vacant apartment located at 6901 East End Avenue in Chicago. Williams and Ayers drove back to Naperville to move Victim 1's car to another location so it would appear as if Victim 1 had left his store for the night after closing. After moving the car, Williams and Ayers drove to the vacant apartment on East End, which they referred to as the "trap."

At Williams's direction, the conspirators forced Victim 1 to talk by phone with his family members to obtain money for his release. A summary chart reflecting calls made to Victim 1's brother, sister, and wife is attached as <u>Exhibit F</u>. However, they were unable to obtain the ransom. While they held Victim 1 captive at the "trap," Davis texted Williams to "grab phone too n Mac book Lmaoo." Williams responded: "Okay I will. Only grab him." *See* Exhibit C.

Victim 1 was interrogated about how to get into his store, whether his store had an alarm, the store's video surveillance system, and where the money and cell

phones were stored. As Victim 1 explained when he testified at trial, they also wanted Victim 1 to identify other potential victims:

> They were—they got mad because they wanted more money, and they wanted me to tell them information about anybody that has money, family. I wouldn't do that. They told me, tell us anybody, somebody you don't like, an enemy, whatever. Just put us on somebody that has money. I'm like, I wouldn't even wish this upon my enemy. I wouldn't do that to nobody. I would rather die.

Tr. 1104.

Frustrated with their inability to get what they wanted and with Victim 1's refusal to fully cooperate with their questions and demands, the conspirators threatened and physically assaulted him. At trial, Victim 1 described the nature and extent of the threats and physical abuse that he endured:

> They were threatening to kill me, to cut off my hands, cut off my dick, cut off my fingers. You know, and I told them I don't have no money at home. And I told them, you know, my wife is eight-and-a-half weeks pregnant, if you guys go there, she's going to freak out. They're like, we'll stab that bitch in her stomach.
>
> ....
>
> And it was like time froze. I felt like I was in there for three months. Yet like some of the times they were beating me— it wasn't even beating because I wasn't able to defend myself, you know. And I didn't fight. I was tied up. And they are beating me and torturing me and laughing. Like laughing. Some dude stood on my head. Just standing. I was laying on the side. He standing on my head. They used a stun gun. They were punching me. One dude's like, "I used to be a boxer," and start punching me, you know. And saying crazy shit. "We're going to go to your house, we're going to rape your wife, we're going to rape your daughters. We are going to kill. We're going to do all this."

7

....

> They used their hands, they used sticks, they used metal. They used—I don't know what the hell they used. They used everything, you know. I got hit with everything that night.
>
> ....
>
> One of them stood on my head. Like I was on to the side and he was standing on top of my head and laughing, you know.
>
> ....
>
> They put a t-shirt on top of my face and poured some water on it.

Tr. 1100–1106.

At one point, while another (now deceased) co-conspirator Benjamin Dawkins held Victim 1 down and La pointed a gun at Victim 1, Vargas shoved a metal pipe into Victim 1's anus. At trial, Ayers described what unfolded:

> When I went over—when we went over there—I came in first, Sed [Williams] was behind me—I saw [Victim 1] with one handcuff out off his arm, wrist, and them wrestling, B.J. [Dawkins] wrestling with him and Shirt-Off [Vargas] wrestling with him, and fighting him, kicking him, stomping him, as [Victim 1] trying to run. And B.J. slams him, La pulled out a gun and put it to his head, and Shirt-Off say, "Now you wanna fucking play with me," and handcuff him again and just—he runs and grab a pole, pulls his pants down, and he said, "You wanna fucking play?" And he shoved it up his ass.

Tr. 392–393. Victim 1 described the horror he was subjected to at the hands of Williams and his co-conspirators: "I feared for my life. I thought I was going to die. I was praying to God that I stay alive. But at the same time, I was praying for death. I

8

was praying to God that he puts me out of my misery. You know, I just prayed that I die." Tr. 1107.

As a result of these violent assaults, Victim 1 told the conspirators that his store did not have an alarm and that there was $20,000 in cash and cell phones in his store, which the conspirators proceeded to steal, in addition to removing the store's video surveillance recording system. Then, in the early morning hours of October 18, the conspirators drove Victim 1 to an empty lot on the south side of Chicago and dumped him there.

Victim 1 managed to get himself to a nearby gas station. An ambulance took him the hospital, where he received emergency room treatment and then underwent multiple surgeries for the injuries he sustained during his abduction, which included fractures of his eye sockets, nose, and jaw, and serious rectal injuries requiring the surgical implantation of a colostomy bag. Photographs taken of Victim 1 at the hospital are attached as Exhibit 4 to the GVO, and excerpts from Victim 1's emergency room treatment records are attached as Exhibit 5 to the GVO.

### C. Interstate 88 (November 8, 2019)

On November 8, 2019, Ayers, La, Vargas, and Dawkins abducted and robbed a victim on Interstate 88. *See* PSR, ¶ 84. According to Ayers, Williams identified the target of that robbery. On the evening of the robbery, Ayers, La, Vargas, and Dawkins followed the victim in their Chevrolet Malibu as the victim drove westbound on Interstates 290 and 88 in a Dodge Durango. They pulled the victim over by pretending to be law enforcement officers. Armed with firearms and wearing ballistic vests, La

9

and Vargas approached the victim's car, ordered the victim out of the car at gunpoint, placed the victim in handcuffs, and attempted to get the victim into the conspirators' car. However, the victim was able to break away and flee from the conspirators before they got him into their car. The conspirators then moved the victim's car and stole money and narcotics from inside that car. The Illinois State Police Report is attached as <u>Exhibit G</u>; *see also* Dkt. 184 (Ayer's plea agreement) at p. 5.

### D.    Seizure of Malibu and Arrest of Vargas (November 2019)

On November 12, 2019, Ayers was pulled over while driving the Chevrolet Malibu. Ayers was arrested but released on bond shortly thereafter. Law enforcement seized and searched the Malibu. Law enforcement recovered police equipment in the Malibu, including a police radio with Williams's DNA on it and a Cook County Sheriff's hat with La's DNA on it.



*Police radio and Cook County Sheriff's hat recovered from Malibu*

On November 15, 2019, Vargas was arrested and charged with a narcotics offense in the Circuit Court of Cook County, Illinois. Vargas remained in state custody through the remainder of the charged conspiracy. On November 19, 2019, La

ran multiple internet searches concerning Vargas's arrest, which are attached as Exhibit H.

### E. Westchester (November 16, 2019)

On November 16, 2019, Williams, Ayers, Dawkins, and another coconspirator seized and confined Victim 2, Victim 3, Victim 4, and Victim 5 in the basement of their home in Westchester, as part of an armed robbery that involved impersonating DEA agents. *See* PSR, ¶¶ 6, 25–26.

One of Ayers's associates, Francine Rogers, identified the primary victim (Victim 2) as someone she believed to be a drug dealer who had money and jewelry. Ayers and Dawkins relayed that information to Williams. Rogers provided Ayers with photographs of Victim 2 and his home address. Following the seizure of the Malibu, Williams borrowed a Chevrolet Impala for them to use in Westchester. Before the robbery, Williams and Ayers conducted surveillance on Victim 2's house. While Williams was conducting surveillance, Davis texted Williams: "I thought u was out taking care [of] business." Williams responded: "I am." The text message exchange is attached as Exhibit I.

Later that evening, at Williams's direction (which was communicated to Rogers by Ayers), Rogers went out on a date with Victim 2 in Chicago. Rogers kept Ayers advised by text about the status of Victim 2's location and other information about Victim 2. After Victim 2 finished his date with Rogers, Victim 2 dropped Rogers off at her home south of the city. Williams, Ayers, Dawkins, and the other co-conspirator followed Victim 2 as he drove back to his home in Westchester. They were in the

Impala, which had been outfitted with police-style emergency lights. As Victim 2 approached his home, they pulled Victim 2 over by pretending to be law enforcement. Ring camera video footage depicting the stop is attached as <u>Exhibit J</u>.



*Screenshot from Ring camera footage of*
*Victim 2 getting pulled over by Williams and his co-conspirators*

They falsely identified themselves as DEA agents, ordered Victim 2 out of his car at gunpoint, placed him in handcuffs, and brought him into the home. When they got into the home, they encountered Victim 2's mother (Victim 3). Victim 3, who was 69 years old at the time of the incident, described the scene at trial:

> I was asleep. And I heard my son call me, call me "Ma, come here." So that woke me up, and I came down. And I saw these men standing there halfway down the stairs. I was halfway down the stairs when I saw them. … I kind of freaked out. You know, I think I kind of went into a little shock, you know, mode because I didn't know. I was confused. I didn't understand what was going on.

Tr. 1002. Victim 2 and Victim 3 were forced into the basement at gunpoint. Later, Victim 2's son (Victim 4) and his son's friend (Victim 5) arrived at the home. They, too, were forced into the basement at gunpoint and restrained. While the victims were confined in the basement, Williams and his co-conspirators searched the home and

stole approximately $300. As Victim 2 testified at trial, before leaving, the conspirators brought him up to the kitchen and threatened him at gunpoint:

> They took me upstairs to the kitchen, put me on my knees. And the guy was telling me, "You got to give us something. Give us something. Give us a safe house. Give us something. Somebody sent us here for you" or something like—I'm like, "I don't know what you're talking about." He said, "You got to give us something, man. We ain't leaving here without nothing."

Tr. 962–963. They took jewelry off him and left. After they left, the victims called the police. Excerpts from the 911 call are attached as <u>Exhibit K</u> and <u>Exhibit L</u>.

### F. South Holland (December 11–12, 2019)

On December 11–12, 2019, Williams, Ayers, La, and Chad Oliff attempted to seize and confine Victim 6 in his home in South Holland, Illinois, by impersonating law enforcement officers. *See* PSR, ¶¶ 7, 27–29.

About a week earlier, on December 4, 2019, Williams had a text exchange with Davis, whose ballistic vest Williams had borrowed (but at that point had failed to return) in furtherance of the conspiracy. When Davis threatened to tell victims that Williams had robbed them, Williams responded: "Bitch, who cares. An tell them have more money next time." The text message exchange is attached as <u>Exhibit M</u>.

A few days before the South Holland incident, Williams had suggested Victim 6 as a target to Ayers based on Williams's understanding that Victim 6 had tens of thousands of dollars in cash inside his house. The conspirators planned and agreed that La and Oliff would gain access to Victim 6's home by pretending to be law enforcement officers. Once inside the home, they planned to place Victim 6 in

handcuffs and then search the home for money and other valuables. Williams and Ayers were going to serve as lookouts who would be on standby to enter the home, if needed, and assist La and Oliff.

On the evening of the attempted home invasion, the conspirators met up on the south side of Chicago and drove to South Holland together in the Chevrolet Impala that Williams had borrowed. When they got to Victim 6's home, La and Oliff got out of the Impala and approached the home. They were armed, wearing ballistic vests, and carrying handcuffs, flashlights, and radios.[1] During his direct examination, Ayers described their approach:

| | |
|---|---|
| AUSA: | Did Chad have a gun? |
| AYERS: | Yes. |
| AUSA: | Did Tai La have a gun? |
| AYERS: | Yes. |
| AYERS: | How do you know? |
| AYERS: | I saw it. |
| AUSA: | Did you hear anything? |
| AYERS: | Yes. |
| AUSA: | What did you hear? |
| AYERS: | Before they got out the car, as they was getting out the car, La cocked the gun back. |

[1] La possessed a Smith and Wesson, Model SD9VE, 9mm semiautomatic pistol, bearing serial number FYW1476. Oliff, who was not a convicted felon, possessed a 9mm semiautomatic pistol with a Glock-model slide.

| AUSA: | Could you see them approach the house? |
|---|---|
| AYERS: | Yes. |
| AUSA: | What happened when they got to the front door? |
| AYERS: | Knocked on the door, waved the flashlights at the windows, knocked, continued to knock. |
| AUSA: | And if the person inside had answered the door, what was the plan? |
| AYERS: | To arrest him, put him in handcuffs, subdue him and then search the house for money, drugs and guns. |

Tr. 349–450.

When La and Oliff reached the front door of Victim 6's home, they identified themselves as police officers and began knocking on the door. Instead of coming to the door, Victim 6 called 911. Shortly thereafter, an officer with the South Holland Police Department arrived on the scene. When the officer arrived, Williams and Ayers fled in the Impala but were stopped by another responding South Holland police officer about a block away from Victim 6's home and subsequently arrested. Meanwhile, La and Oliff fled from the scene on foot. They ran through the alley located behind Victim 6's home, discarding their firearms and police gear as they fled. La was stopped and arrested by the FBI about a mile west of Victim 6's home.

15



*Items discarded by La and Oliff*
*as they fled from the South Holland scene*

Initially, Williams was charged by complaint with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. At his preliminary hearing, Williams learned that the FBI had been tracking his location. Dkt. 27, 83. After the hearing, Williams called his brother from jail and relayed the following:

> It's like how the fuck they been following you five minutes before? …. I'm tell you, bro. I'm so happy, bro. … I would've gotten life in jail, bro. … I would've been in jail for a long time.

A copy of the jail call recording is attached as Exhibit N.

16

### III. A SENTENCE OF LIFE IMPRISONMENT IS CONSISTENT WITH THE PURPOSES OF SECTION 3553(A)

Considering the Section 3553(a) factors, including the nature and circumstances of the offense as well as Williams's personal history and characteristics, a life sentence is necessary to reflect the seriousness of the offense, promote respect for the law, provide a just punishment for the offense, afford adequate deterrence, and protect the public.

### A. Sentencing Guidelines

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. To determine the sentence to impose, the Court must consider the statutory factors listed in Section 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines. 18 U.S.C. § 3553(a)(4). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

The Sentencing Guidelines are the sole factor in Section 3553(a) that provides an objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily mandated factor. 18 U.S.C. § 3553(a)(6); *see United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."). The Supreme Court created the

advisory Guidelines system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker v. United States*, 543 U.S. 220, 264–65 (2005). The only way to prevent widespread unwarranted disparities is to give serious consideration to the Sentencing Guidelines.

The Sentencing Guidelines also generally deserve serious consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46. The Commission is "a respected public body with access to the best knowledge and practices of penology." *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007). Furthermore, the Sentencing Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system, 28 U.S.C. § 994(o), and these ongoing efforts to refine the Guidelines are another reason to seriously consider the advisory range.

### B.    Sentencing Guidelines Calculation

As discussed below, the total offense level is 43. Williams's criminal history category is I. The advisory sentencing guidelines range is life imprisonment.

***Count One***
***Kidnapping Conspiracy***

Application Note 8 to Guideline § 3D1.2 provides:

> A defendant may be convicted of conspiring to commit several substantive offenses and also of committing one or

> more of the substantive offenses. In such cases, treat the
> conspiracy count as if it were several counts, each charging
> conspiracy to commit one of the substantive offenses. *See*
> §1B1.2(d) and accompanying commentary. Then apply the
> ordinary grouping rules to determine the combined offense
> level based upon the substantive counts of which the
> defendant is convicted and the various acts cited by the
> conspiracy count that would constitute behavior of a
> substantive nature.

*See, e.g.*, *United States v. Torrealba*, 339 F.3d 1238, 1242–43 (8th Cir. 2003) ("Thus, where a conspiracy involves multiple victims, the defendant should be deemed to have conspired to commit an equal number of substantive offenses, and the conspiracy count should be divided under § 3D1.2 into that same number of distinct crimes for sentencing purposes."). Here, the kidnapping conspiracy charged in Count One involved the three substantive offenses charged in Count Two (Naperville), Counts Three–Seven (Westchester), and Count Eight (South Holland).

### Counts One and Two
### Naperville Kidnapping of Victim 1

The Probation Office and the parties agree that the base offense level is 32, pursuant to Guideline §§ 2A4.1(a) and 2X1.1; that the offense level is increased by two levels, pursuant to Guideline § 2A4.1(b)(3), because a dangerous weapon was used; and that the offense level is increased by two levels, pursuant to Guideline § 3C1.1, for obstruction of justice. PSR, ¶¶ 38, 41, 44; Defendant's Sentencing Memorandum, p. 5.

The government agrees with the Probation Office that the offense level is increased by six levels, pursuant to Guideline § 2A4.1(b)(1), because a ransom

demand was made, and that the offense level is increased by four levels, pursuant to Guideline § 2A4.1(b)(2)(A), because a victim (Victim 1) sustained a "permanent or life-threatening bodily injury." PSR, ¶¶ 39–40. Williams objects to the application of these enhancements. Defendant's Sentencing Memorandum, p. 1–4.

First, Williams contends that the government has not proven by a preponderance of the evidence that a ransom demand was made and, as such, the two-level enhancement under Guidelines § 2A4.1 should not apply. Defendant's Sentencing Memorandum, p. 1–3. Application Note 4 to Guidelines § 2A4.1 provides:

> In the case of a conspiracy, attempt, or solicitation to kidnap, §2X1.1 (Attempt, Solicitation, or Conspiracy) requires that the court apply any adjustment that can be determined with reasonable certainty. Therefore, for example, if an offense involved conspiracy to kidnap for the purpose of committing murder, subsection (b)(7) would reference first degree murder (resulting in an offense level of 43, subject to a possible 3-level reduction under § 2X1.1(b)). Similarly, for example, if an offense involved a kidnapping during which a participant attempted to murder the victim under circumstances that would have constituted first degree murder had death occurred, the offense referenced under subsection (b)(7) would be the offense of first-degree murder.

*See United States v. Ferreira*, 275 F.3d 1020, 1029–30 (11th Cir. 2001) ("[A]ppellants' contention that a ransom note must actually have been delivered is directly contrary to the application note's requirement that the court apply any adjustment that can be determined with 'reasonable certainty.'"); *see also, e.g., United States v. Torrealba*, 339 F.3d 1238, 1244–46 (11th Cir. 2003) (affirming district court's decision to apply ransom enhancement even though the ransom demand letter was not delivered to the

intended third party—because the offenders were apprehended—where "repeated phone calls to [the third party] together with the torn letter made it 'reasonably certain' that the appellants would have made a ransom demand if doing so had been feasible").

Citing *United States v. Reynolds*, 714 F.3d 1039 (7th Cir. 2013), Williams argues that for the enhancement to apply, the ransom demand must reach a third party. *Id*. at 2–3.[2] In *Reynolds*, the contested ransom demand concerned the offenders insisting that the victim "give them more money or drugs and did not intend to release him until he gave them something more." *Reynolds*, 714 F.3d at 1043. In finding that the ransom enhancement did not apply in that case, the Court observed, "[W]e have not found a single appellate decision where the adjustment had been applied to a defendant who did not *intend* for his demands to reach a third party." *Id*. at 1045 (emphasis added).

Unlike the offenders in *Reynolds*, Williams and his co-conspirators did intend for their ransom demands to reach a third party, namely, Victim 1's brother. At trial, Ayers testified that part of the kidnapping plan involved obtaining money from Victim 1's brother. Tr. 349–50. After they abducted Victim 1 and, at Williams's direction, brought him to the "trap" house, they called Victim 1's family members in an effort to get his "brother to pay us the money to let him go." Tr. 389–92. Victim 1

---

[2] Williams also cites *United States v. Alvarez-Cuevas*, 415 F.3d 121 (7th Cir. 2005). Defendant's Sentencing Brief, p. 3. However, that case concerned the application of Guideline § 2A4.1(b)(6), not § 2A4.1(b)(1).

testified that his abductors "tried getting in touch with—they got in touch with my brother, to ask him for money. … half a million dollars." Tr. 1101. At trial, the government introduced toll records reflecting that, while they held Victim 1 captive, the conspirators used a burner phone to make approximately 38 calls to Victim 1's brother as well as approximately 36 calls to his wife and sister. *See* Exhibit F. These were not courtesy calls. They were made in an effort to extract a ransom from Victim 1's brother. Given that extracting a ransom from a third party was a goal of the kidnapping conspiracy, which they took substantive steps to effectuate, the enhancement applies even though they were ultimately unsuccessful.

Second, while acknowledging that Victim 1 suffered permanent injuries at the hands of his captors, Williams nevertheless contends that he should not be held responsible under the Guidelines for those injuries because he did not personally inflict the injuries, Vargas's actions were not "necessary to effectuate the kidnapping or robbery," and one of the many specific acts of violence perpetrated against Victim 1 that night (sodomizing him with a pole) was purportedly not foreseeable to Williams. Defendant's Sentencing Brief, p. 3–4. Contrary to Williams's argument, Williams is accountable for Victim 1's permanent injuries under the Guidelines.

Guideline § 1B1.3(a)(1)(B) provides:

> In the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal

22

> activity, and (iii) reasonably foreseeable in connection with
> that criminal activity; that occurred during the commission
> of the offense of conviction, in preparation for that offense,
> or in the course of attempting to avoid detection or
> responsibility for that offense.

Application Note 3(D) provides an example of the kind of reasonably foreseeable and jointly undertaken criminal activity for which a defendant would be held accountable under the Guidelines:

> For example, two defendants agree to commit a robbery
> and, during the course of that robbery, the first defendant
> assaults and injures a victim. The second defendant is
> accountable for the assault and injury to the victim (even
> if the second defendant had not agreed to the assault and
> had cautioned the first defendant to be careful not to hurt
> anyone) because the assaultive conduct was within the
> scope of the jointly undertaken criminal activity (the
> robbery), was in furtherance of that criminal activity (the
> robbery), and was reasonably foreseeable in connection
> with that criminal activity (given the nature of the offense).

Here, as established at trial, Williams orchestrated Victim 1's kidnapping, during which Victim 1 sustained the permanent injuries. Williams identified Victim 1 as the kidnapping target, put together an abduction plan, conducted surveillance of Victim 1 and his store days in advance of the kidnapping as well as the night of the abduction, and organized a crew to carry out the offense—a crew that included Vargas and La. At Williams's direction, the crew abducted Victim 1 at gunpoint, handcuffed him, blindfolded him, and tossed him into the backseat of the Chevrolet Malibu. Then, at Williams's direction, they transported Victim 1 to the "trap" house, where they threatened, beat, and tortured Victim 1 in order to extract information from him and

23

obtain money and other valuable items from him and his brother. Initially, Victim 1 refused to cooperate with his abductors. To get what they wanted, Vargas— in Williams's presence—sodomized Victim 1 with a metal pipe while La and Dawkins held him down at gunpoint. As a result of these violent assaults, Victim 1 told the conspirators that his store did not have an alarm and that there was $20,000 in cash and cell phones in his store, which they proceeded to steal. Then, in the early morning hours of October 18, Williams and his co-conspirators dumped Victim 1 in an empty lot on the south side of Chicago. *See* Tr. 346–58, 363–96, 1079–1109.

In *United States v. Frazier*, 129 F.4th 392 (7th Cir. 2025), Kenwyn Frazier and Kendrick Frazier kidnapped Kein Eastman. Kenwyn Frazier abducted Eastman at gunpoint and took him to an apartment where, among other things, Kendrick Frazier shot him, causing the victim to sustain a permanent or life-threatening injury. *Frazier*, 129 F.4th at 397–98, 407. Although Kenwyn Frazier did not shoot Eastman, the Seventh Circuit found that the injury enhancement nevertheless applied to him. The Court explained:

> Where a defendant jointly undertakes criminal activity, the "relevant conduct" for sentencing purposes includes all reasonably foreseeable acts within the scope of and in furtherance of the crime. *See* U.S.S.G. § 1B1.3(a)(1)(B). The Fraziers jointly participated in the violent crime of kidnapping, and Kenwyn was an active participant at all times and in all relevant events. Further, the shooting occurred within the scope of the criminal activity, in furtherance of that activity, and was reasonably foreseeable in connection with it. Our conclusion that there is no infirmity with the district court's application of the

24

sentencing enhancement, then, extends and applies in full
to Kenwyn.

The same is true here. The assaultive conduct that caused Victim 1's injuries was within the scope of the jointly undertaken criminal activity (the violent kidnapping that Williams orchestrated and oversaw), was in furtherance of that criminal activity, and was reasonably foreseeable to Williams in connection with that criminal activity. Accordingly, the permanent injury enhancement applies to Williams, resulting in a total offense level of 46.

### Counts One, Three, and Seven
### Westchester Kidnapping of Victim 2

The Probation Office and the parties agree that the base offense level is 32, pursuant to Guideline § 2A4.1(a). The offense level is increased by two levels, pursuant to Guideline § 2A4.1(b)(3), because a dangerous weapon was used. Accordingly, the total offense level is 34. PSR, ¶¶ 46–51; Defendant's Sentencing Memorandum, p. 5.

### Counts One, Four, and Seven
### Westchester Kidnapping of Victim 3

The Probation Office and the parties agree that the base offense level is 32, pursuant to Guideline § 2A4.1(a). The offense level is increased by two levels, pursuant to Guideline § 2A4.1(b)(3), Count Four is 34. PSR, ¶¶ 52–57; Defendant's Sentencing Memorandum, p. 5.

### Counts One, Five, and Seven
### Westchester Kidnapping of Victim 4

The Probation Office and the parties agree that the base offense level is 32, pursuant to Guideline § 2A4.1(a). The offense level is increased by two levels, pursuant to Guideline § 2A4.1(b)(3), because a dangerous weapon was used. Accordingly, the total offense level is 34. PSR, ¶¶ 58–63; Defendant's Sentencing Memorandum, p. 5.

### Counts One, Six, and Seven
### Westchester Kidnapping of Victim 5

The Probation Office and the parties agree that the base offense level is 32, pursuant to Guideline § 2A4.1(a). The offense level is increased by two levels, pursuant to Guideline § 2A4.1(b)(3), because a dangerous weapon was used. Accordingly, the total offense level is 34. PSR, ¶¶ 64–69; Defendant's Sentencing Memorandum, p. 5.

### Counts One and Eight
### South Holland Attempted Kidnapping of Victim 6

The Probation Office and the parties agree that the base offense level is 32, pursuant to Guideline §§ 2A4.1(a) and 2X1.1. The offense level is increased by two levels, pursuant to Guideline § 2A4.1(b)(3), because a dangerous weapon was used. Accordingly, the total offense level is 34. PSR, ¶¶ 70–75; Defendant's Sentencing Memorandum, p. 5.

### *Combined Offense Level*

The government agrees with the Probation Office that, pursuant to Guideline § 3D1.2, the counts group as follows:

| Groups | Offense Level |
|---|---|
| Group 1 (Counts One & Two) | 46 |
| Group 2 (Counts One, Three, & Seven) | 34 |
| Group 3 (Counts One, Four, & Seven) | 34 |
| Group 4 (Counts One, Five, & Seven) | 34 |
| Group 5 (Counts One, Six, & Seven) | 34 |
| Group 6 (Counts One and Eight) | 34 |

Pursuant to Guideline § 3D1.4(a), Group 1 counts as one Unit because it is the group with the highest offense level, namely, an offense level of 46. Pursuant to Guideline § 3D1.4(d), the remaining Groups do not count as additional Units because they are nine or more levels less serious than the Group with the highest offense level. Pursuant to Guideline § 3D1.4, because there is one Unit, no additional levels are added to the Group with the highest offense level, which is 46. Pursuant to Application Note 2 to Guideline § 5A, a total offense level greater than 43 shall be treated as an offense level of 43. Therefore, the total offense level is 43.

### *Criminal History*

The government agrees with the Probation Office that Williams's criminal history category is I. PSR, ¶¶ 90–112.

### *Sentencing Guidelines Range*

With a total offense level of 43 and a criminal history category of I, Williams's Sentencing Guidelines range is life imprisonment. PSR, ¶ 169.

### C.    Nature and Circumstances of the Offense

As evidenced at trial and discussed above, between September 2019 and December 2019, Williams orchestrated a series of incredibly violent abductions and armed robberies throughout Chicago and the neighboring suburbs. Impersonating law enforcement officers, Williams and his co-conspirators ruthlessly threatened, restrained, beat, robbed, kidnapped, terrorized, and tortured people for their own personal gain. In Naperville, pretending to be the police, they grabbed and handcuffed Victim 1 outside his electronics store at gunpoint, tossed him into the backseat of their Chevrolet Malibu, and brought him to their "trap" house where they proceeded to interrogate, threaten, abuse, torture, and rob him. In Westchester, Williams and his co-conspirators used the promise of a date night to track and then trap Victim 2 outside of his house in Westchester. Then, pretending to be DEA agents, they grabbed Victim 2 and handcuffed him at gunpoint. They forced him, his elderly mother, his son, and his son's girlfriend into the basement of their home and held them there while they searched the house for money and drugs, interrogated Victim 2, threatened him, and robbed him. In South Holland, they planned to do the same thing until the real police showed up and put a stop to their rampage of terror. Weeks after his arrest, Williams told his brother that if the police had arrived five minutes later, he "would've gotten life in jail, bro. … I would've been in jail for a long time." On that jail call, Williams appears to have grasped the gravity and seriousness of his offense conduct, for which a life sentence is warranted.

28

### D.    Williams's Personal History and Characteristics

Williams's life has been marred by violence. Despite having lost multiple family members to gun violence and having been shot four times himself (PSR, ¶¶ 141–51), Williams's own personal experiences with the pain, trauma, and loss that violence brings have not deterred him from inflicting violence on others for his own personal benefit.

Despite being in his early 40s when he was arrested in this case, Williams does not have a history of employment, relaying to the Probation Officer that "he financially supported himself by gambling and by performing 'odd jobs' for family, friends, and acquaintances." PSR, ¶ 162. Instead, what Williams does have is an extensive criminal history.[3] When he was 17 years old, Williams was arrested for attempted murder, armed violence, aggravated battery, and attempted criminal sexual abuse in cases that were later dismissed. PSR, ¶¶ 116–17, 120. When he was 18 years old, Williams was arrested for the illegal possession of a firearm. PSR, ¶ 92. While his gun case was pending, Williams was arrested for selling cocaine. PSR, ¶ 94. In October 1995, Williams was convicted in both cases and received concurrent sentences of 30 months' probation, which he subsequently violated, and was sentenced to four months of home confinement. PSR, ¶¶ 92, 94.

---

[3] Although Williams was not convicted of all the charges set forth here, the Court may consider Williams's substantial history of arrests for kidnapping, battery, and firearms offenses at sentencing as a reliable indicator of a pattern of criminality that suggests a risk of recidivism. *See United States v. Mansfield*, 21 F.4th 946, 955–58 (7th Cir. 2021).

When he was 19 and 20 years old, Williams was arrested for assault, battery, and criminal sexual abuse; the cases were later dismissed. PSR, ¶¶ 121, 124, 127. In May 2000, Williams was arrested for aggravated fleeing from the police. PSR, ¶ 92. The following month, he was arrested again for being a felon in possession of a firearm, in connection with which he was also charged with two counts of attempted murder, three counts of aggravated battery with a firearm, one count of aggravated discharge of a firearm, four counts of aggravated unlawful use of a weapon, and one count of aggravated fleeing from the police. PSR, ¶¶ 103–04. On April 29, 2002, Williams was convicted of being a felon in possession of a firearm, for which he received a sentence of two years' imprisonment; the other charges were dismissed. PSR, ¶ 104. A few weeks earlier, Williams had been arrested for aggravated kidnapping/ransom, aggravated kidnapping/armed with firearm, being a felon in possession of a firearm, aggravated unlawful use of a weapon, and aggravated unlawful restraint; he was later found not guilty of the charges. PSR, ¶ 132.

In October 2002, Williams was released from custody on parole, and his sentence was discharged in October 2003. PSR, ¶ 104. A month later, Williams was arrested for assault; the victim reported that Williams threatened to "blow [the victim's] head off and kill his mother." PSR, ¶ 135. The case was dismissed in January 2004. PSR, ¶ 135. A few months later, in April 2004, Williams was arrested on charges of aggravated vehicle hijacking and aggravated kidnapping. PSR, ¶ 108. Convicted in November 2008, Williams was sentenced to 25 years' imprisonment;

however, his conviction was overturned on appeal. PSR, ¶ 108; *see also People v. Williams*, 383 Ill.App.3d 596 (2008).

Williams was released from custody on August 5, 2008; two weeks later, he was arrested for criminal trespass, for which he later was convicted. PSR, ¶¶ 108–09. Two years later, Williams was arrested for reckless conduct, for which he later was convicted. PSR, ¶ 110. In 2017, Williams was arrested for identity deception; in January 2019, Williams pleaded guilty and received a two-year sentence of imprisonment that was suspended to be served as a sentence of probation. PSR, ¶ 111. In April 2019, Williams was arrested for aggravated fleeing from a police officer in a case that is still pending in state court. PSR, ¶ 114. Williams then proceeded to commit the kidnapping offenses while on probation.

As evidenced by his offense conduct in this case, none of Williams's prior contacts with the criminal justice system deterred him from committing serious, violent crime in our community.

### E. Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide a Just Punishment, and Protect the Public

As the Court observed firsthand, having heard testimony from the victims at trial, the seriousness of Williams's offense conduct cannot be overstated. Williams and his co-conspirators showed their victims no mercy. In the midst of the conspiracy, Davis threatened to out Williams to his victims and predicted he would get indicted. Williams responded "Bitch, who cares. An tell them have more money next time." *See* Exhibit M. Even after getting caught in the act and charged with the crimes he

committed, Williams refused to accept responsibility for his criminal conduct and has not shown any remorse for the significant harm that he and his co-conspirators inflicted on their victims. Williams's troubling criminal record (PSR, ¶¶ 90–139), efforts to obstruct justice (PSR, ¶¶ 33, 44), and egregious offense conduct (PSR, ¶¶ 18–32) reflect a lack of respect for the law and demonstrate that he poses a risk of recidivism, both of which must be accounted for in the sentence imposed by this Court.

In sentencing Williams, the Court has an important role to play in protecting the public from harm. Given his demonstrated disregard for other people's lives, Williams poses a danger to our community. A life sentence will serve to ensure that he does not harm anyone else ever again. Moreover, considering the incredibly serious and deadly nature of Williams's offense conduct, the sentence imposed here must serve to deter Williams (if he is ever released from custody) and others from committing similar acts of violence and, thereby, protect the public. A life sentence would send a clear and important message to the community that engaging in serious acts of violence against others—robbing, beating, abducting, and torturing people— will not be tolerated. It is imperative that the message be received by those who, like Williams, evince a callous disregard for other people's lives and are otherwise undeterred from terrorizing the men, women, and children who live and work in and around Chicago with brutal violence. The safety of our community depends on this.

32

## IV. CONCLUSION

For the foregoing reasons, the government requests that the Court sentence Sedgwick Williams to life imprisonment.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: _____
JARED JODREY
KATE MCCLELLAND
Assistant United States Attorneys
United States Attorney's Office
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
312-353-5358